**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CONSERVE BIG BEND,<br>PO Box 404, Marfa, TX 79843,<br><br>CHARLES L. CECIL IV, JOHN FERGUSON, DAVID KELLER, NADINE PINEDA MATA, JOE PINEDA, and LEO NUNEZ PINEDA,<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528,<br><br>U.S. CUSTOMS AND BORDER PROTECTION, 1300 Pennsylvania Ave. NW, Washington, DC 20229,<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528,<br><br>RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection, 1300 Pennsylvania Ave. NW, Washington, DC 20229,<br><br>*Defendants*. | Case No. ____________________ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. The Big Bend region of Texas is one of the most remote, rugged, and ecologically significant stretches of the United States. It is a landscape defined by formidable natural barriers and has long recorded the lowest levels of unauthorized crossings anywhere along the southwest border. Yet Defendants have selected this majestic landscape for expedited border wall construction based on the Secretary of Homeland Security's (the "Secretary") determination that the "Big Bend Sector" is an area of "high illegal entry" under Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). That high-illegal-entry determination is the legal predicate for Defendants' invocation of extraordinary power to immediately construct a 30-foot-high border wall while bypassing all federal, state, and local procedural protections. That determination is legally and factually unsound and unsupported.

2. Defendants Department of Homeland Security ("DHS") and the Secretary exceeded their delegated powers and statutory authority by issuing a series of notices ("Determinations") that each improperly concluded that the lands owned by Plaintiffs and areas affecting Plaintiffs' interests are part of an area of "high illegal entry" under IIRIRA Section 102(a). Defendants' Determinations of "high illegal entry" in the Big Bend region are contradicted by a host of government statistics and other public reporting that show that the opposite is true—that the Big Bend sector is the area of the lowest illegal entry along the southwest border. Indeed, as detailed below, the Big Bend sector has recorded the fewest yearly apprehensions of any southwest sector for the last 53 years, with last year's numbers being the lowest yearly apprehension total recorded by any sector in the region since 1967.

3. Further, in contravention of IIRIRA, Defendants failed to make a determination that construction of the border wall in the areas that encroach on Plaintiffs' land and interests was the

"most appropriate means to achieve and maintain operational control" of the southwest border, or that these are the areas in which fencing would be the "most practical and effective." As set forth below, there is no legal, factual, or operational basis for such a determination.

4. Nonetheless, the Secretary relied upon this flawed "high illegal entry" assertion to authorize and take actions toward installing physical barriers and roads in the Big Bend sector (the "Big Bend Border Wall Project" or the "Project"). The Secretary's decision also enabled him to unlock an expedited construction process—a process that grants the government special acquisition authority over private lands and allows the Secretary to waive requirements under numerous federal statutes and regulations that protect the rights of Plaintiffs and preserve and safeguard the environment and precious wildlife found in the Big Bend region. The unsupported and sweeping high-illegal-entry finding by the Secretary under Section 102(a) violates the plain text of IIRIRA, is unconstitutional, constitutes an abuse of discretion, and is arbitrary and capricious. Defendants' actions are invalid under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, *ultra vires*, and contrary to law.

5. Construction of a 30-foot-high wall and other border barriers across the Big Bend region will irreparably harm Plaintiffs by depriving them of their right to use and enjoy their property, extinguishing their economic interests, and impairing and damaging the region without legal basis or any rational reason. The subject portions of the Big Bend region are landscapes of extraordinary beauty, shaped by natural barriers along and connected to the river. They provide a wonderland for outdoor activities, fishing, boating, and hiking, and support a vibrant community of long-term residents, businesses, tourists, and visitors. The massive Project will cut through private lands, river corridors, wildlife habitat, cultural landscapes, and communities that depend on access to and enjoyment of the Big Bend region. The result is precisely what Congress did not

authorize: the use of an expedited construction power to permanently alter one of the Nation's most distinctive and least-trafficked landscapes without ordinary deliberation, justification, and procedural safeguards.

## JURISDICTION

6. This Court has jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. §§ 701–706. The claims for relief arise under the laws of the United States, including Section 102 of IIRIRA (8 U.S.C. § 1103 note), 5 U.S.C. §§ 701–706, and the United States Constitution. The relief requested is authorized under 28 U.S.C. §§ 2201–2202, 28 U.S.C. § 1651, and 5 U.S.C. §§ 705–706, and the Court may grant injunctive relief pursuant to its equitable powers.

## VENUE

7. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (e), because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

8. Plaintiff CONSERVE BIG BEND is a Texas nonprofit corporation dedicated to protecting the landscape, cultural heritage, and communities of the greater Big Bend region. Conserve Big Bend serves as an umbrella organization for coordinated community-based education, outreach, and advocacy concerning threats to the Big Bend region. That work is directed at securing transparency and accountability in federal decision-making, protecting the region's cultural and environmental resources, defending landowner rights, and ensuring due process for those whose land and livelihoods are at stake.

9. One of Conserve Big Bend's primary initiatives is the Landowner Coalition ("Coalition"), which, as of September 2026, has over 200 registered members, including private landowners, ranchers, river outfitters, tour guides, archaeologists, scientists, artists, small-business

owners, photojournalists, park users, and conservationists—many of whom have multigenerational ties to the region. Through its Coalition, Conserve Big Bend works directly with and represents affected landowners and other stakeholders regarding the impacts of the proposed wall and related actions. Coalition members participate in and support Conserve Big Bend's advocacy concerning the Project and include individuals whose property and personal interests are directly affected by the challenged Determinations. Several Coalition members rely on their land for their livelihoods, including through ranching, tourism, and providing recreational opportunities to visitors.

10. Many Coalition members own property in Hudspeth, Brewster, Presidio, and Val Verde Counties and have received written notices from U.S. Customs and Border Protection ("CBP") identifying their properties as land that may be needed for border wall construction, access, surveys, appraisals, road construction, vehicle barriers, lighting, cameras, sensors, and related infrastructure. Those notices have advised individual Coalition members that the government may seek temporary or permanent easements, rights of access, leases, or acquisition of property interests. The notices identify specific parcels for potential Project-related activities.

11. Numerous Coalition members have also been presented by CBP with proposed Right-of-Entry for Construction agreements that would grant the government an irrevocable right to enter their property for up to thirty-six months to conduct surveys, appraisals, environmental assessments, soil and water sampling, construction activities, and installation of border-security infrastructure. The proposed agreements authorize entry by government personnel, contractors, and agents and contemplate the construction of barriers, roads, cameras, sensors, lighting, utility infrastructure, and related facilities on or affecting members' properties. The notices expressly warn members that the government may seek temporary or permanent easements, rights of access, leases, or acquisition of property interests and that, if voluntary agreements cannot be reached, the

government may refer the matter to the Department of Justice to acquire the Coalition members' necessary property interests through the exercise of eminent domain.

12. Coalition members who received such notices include, for example, William Joseph Zuberbueler, Sr. Mr. Zuberbueler owns approximately 1,800 acres of land and leases from immediate family and cousins an additional 8,300 acres of land, which have been in his family since 1898. On this land, he has hunting leases and raises livestock, which serve as his only source of income. Between February and July 2026, CBP sent Mr. Zuberbueler multiple notices identifying eleven specific tracts that CBP may need to enter for construction or access for use in the Big Bend Border Wall Project. CBP presented him with a proposed Right-of-Entry for Construction agreement, advising him that it could refer the matter to the United States Department of Justice to take action if a voluntary agreement is not reached. Among other harms, any construction of the wall would place a severe strain on Mr. Zuberbueler's access to the water that he needs to raise his livestock—and consequently would have a discernible adverse impact on Mr. Zuberbueler's business and livelihood. Given the scarcity of water resources in the region, any adverse impact on this water supply has a direct harm on the lifeline for Mr. Zuberbueler and his family. Mr. Zuberbueler does not wish to leave or sell his property but fears that the Project will permanently impair the property's use, enjoyment, and value.

13. Coalition members who have received these notices, including some of the named Plaintiffs below, have been specifically identified by the federal government as owners of property that may be entered, used, burdened, acquired, or condemned for border wall construction and related infrastructure. As a result, they have been forced to expend significant time and resources protecting their property interests, responding to government acquisition efforts, evaluating the consequences of the Project, and addressing the immediate uncertainty created by Defendants'

actions. Moreover, Defendants' actions have interfered with members' present use and enjoyment of their properties and their ability to make long-term personal, business, ranching, recreational, conservation, and investment decisions concerning their land. Conserve Big Bend brings this action on behalf of its Landowner Coalition members.

14. Plaintiff NADINE PINEDA MATA is a landowner in Presidio County, Texas. She and her family, including Plaintiff LEO NUNEZ PINEDA, Plaintiff JOE PINEDA, and Angelina Pineda, own separate interests in approximately 270 acres of land. The property, which has been in their family since the 1870s, is a single, continuous parcel made up of two original homestead sections near Redford, Texas. It is approximately 20 miles from the town of Presidio. The property is divided in half by Farm to Market Road (FM) 170, also known as the River Road or Camino del Rio. Approximately 60 acres of the property are located directly along the Rio Grande River.

15. A substantial part of the property owned by Ms. Pineda Mata and her family has long been used for farming, including raising cattle, growing alfalfa, and maintaining a pecan orchard. The property also includes a cemetery dating back to at least the 1800s, archaeological sites, and a house. The part of the property north of FM 170 is predominantly desert. The portion that is most productive for farming sits along the Rio Grande. Water from the river is used to provide irrigation to grow crops and for grazing animals to drink. Therefore, access to the river is critical to the agricultural purposes to which much of the property historically has been dedicated.

16. The Big Bend Border Wall Project would impede and essentially prevent use of the property for agricultural purposes. The Project would effectively block access from the property to the river, restricting or eliminating the ability to use water from the river to irrigate crops and the ability of animals on the property to access drinking water. Further, a large, fixed barrier of the type contemplated by Defendants would prevent the flow of water on the property and almost

certainly produce severe flooding, which would destroy or substantially impede use of significant portions of the property. Among other things, the Big Bend Border Wall Project would create damming effects, restricting the flow of water from the mountains onto the property and preventing it from entering the Rio Grande and moving downriver. These damming effects would produce a collection of water and property damage, including damage to the residence on the property. The flow of water on the property also brings with it significant debris picked up on the path from the mountains. If a wall is built, even one with slats, the debris would accumulate and block water from draining into the Rio Grande, causing additional flooding on the property. These factors, combined with the lack of access to the river for crop irrigation and animals, would render the property effectively unusable for agriculture.

17. The Big Bend Border Wall Project would also threaten to disturb or eliminate cultural resources, archaeological assets, and burial sites located on the property owned by the family. The property has two burial sites, which include a burial ground for indigenous persons who previously inhabited the area. The property is also in close proximity to archaeological resources, including cave drawings, and there is a rich and treasured history of generations of family members of these Plaintiffs who lived off of the property, honorably built or contributed to the surrounding community, and enjoyed recreation along the river. All of that would be altered forever or eliminated by the Project.

18. Nadine Pineda Mata, Leo Nunez Pineda, and Joe Pineda each received in February 2026 a Notice of Interest from Defendant CBP indicating that access to a portion of their property was needed to conduct environmental assessments, property surveys, appraisals, and other work that may be necessary and incidental to the Government's assessment and acquisition of the property for border infrastructure construction. These Plaintiffs did not grant Defendant CBP that

permission and received subsequent emails in March, April, and August requesting a meeting to discuss their concerns. Defendant CBP then sent each family member a letter indicating that it has "determined that it will be necessary" to initiate federal condemnation proceedings within 90 days to take the property over their objections. The family does not wish to sell or relinquish their property and is deeply opposed to the impending intrusion on their land.

19. Plaintiff CHARLES L. CECIL IV is a medical doctor and a member of the Coalition. Dr. Cecil owns approximately 1,200 acres of land at the confluence of Alamito Creek and the Rio Grande River. Dr. Cecil grew up on the property, which he and his family have owned for 47 years. The property—where he operates an Airbnb and utilizes for public events—supports Dr. Cecil's income, but it also has personal and cultural value to him. Members of Dr. Cecil's family are buried on the property, and Dr. Cecil and his family have a tradition of family hunts on the property. He believes the wall will make these activities impossible to maintain, as guests will be deterred by the structure, the lights of the border wall will impair the dark sky experience, and the wildlife that Dr. Cecil's family relies on for hunting will be adversely affected. Indeed, Dr. Cecil has already observed a reduction in bookings for and interest in the property since the announcement of the Big Bend Border Wall Project.

20. Additionally, a large, fixed barrier would significantly change the conditions and would almost certainly lead to more frequent and more impactful flooding, with worsening impacts on Dr. Cecil's property and more dangerous conditions for Dr. Cecil and his family. Alamito Creek drains a large area and can rise to roughly ten feet. It has previously washed out a bridge and can carry flows estimated at 6,000 to 10,000 cubic feet per second. Because Alamito Creek carries substantial debris, including full-sized trees, the construction of a wall (even one with slats or other pathways for water to theoretically pass) at the confluence of Alamito Creek with the Rio Grande

would likely cause severe back flooding. Back flooding could damage or make unusable certain barns and water wells on Dr. Cecil's property. Any structure blocking or restricting Alamito Creek's flow could impair Dr. Cecil's property even if the wall itself did not occupy all of the land.

21. Plaintiff JOHN FERGUSON is the Mayor of the City of Presidio, Texas. He has a longstanding personal connection to the Big Bend region. He first saw the region when his father brought him there at age 14, and the experience transformed Mr. Ferguson's outlook on life. Mr. Ferguson moved to Presidio after college and has called the Big Bend region home for nearly four decades. Throughout that time, he has visited and enjoyed the Rio Grande and scenic areas of the region. He and his wife are invested in the community, and they own and operate a short-term rental property in Presidio that they purchased and improved as a substantial retirement investment. They invested in this property because of Presidio's growing tourism economy and its role as a gateway to the Big Bend region.

22. In his years as Mayor, Mr. Ferguson has been actively involved in promoting tourism and economic development in Presidio and working with officials in the neighboring municipality of Ojinaga, Chihuahua, to encourage visitation to the region. He has played a lead role in reviewing and raising concerns about the Project's potential impacts on Presidio's flood-control infrastructure.

23. Based on his personal experience as Mayor and longstanding involvement in local tourism initiatives, Mr. Ferguson believes the Big Bend Border Wall Project will substantially diminish tourism in Presidio and the surrounding region. In his judgment, the Project would alter the area's unique character, impair the visitor experience associated with the Rio Grande and surrounding landscapes, undermine the longstanding cross-border relationship between Presidio and Ojinaga that contributes to the region's appeal, and threaten flood-control infrastructure and

drainage systems that protect the community and support the region's tourism economy. Like other short-term rental property owners in Presidio, Mr. Ferguson relies on tourism to the Big Bend region to generate demand for his business and he expects a significant diminution of tourism and the rental income it generates because of the Project.

24. Plaintiff DAVID KELLER is a landowner in Presidio County. He owns a ten-acre farm near Redford, Texas, which includes a historic adobe farmhouse, an acequia, a field, and a levee that borders the Rio Grande River. Mr. Keller regularly uses his property and surrounding river corridor for recreation and enjoyment of the area's natural and cultural resources. He visits the river frequently, often daily, including for boating, guiding river trips, observing wildlife, spending time with his dog, and enjoying the sense of openness, solitude, and connection to nature that the region provides. The Big Bend Board Wall Project, if constructed on or near the levee, would cut through the field and restrict his access to the river, and would also adversely affect irrigation and make the land unusable for farming. It would also create flooding risks and obstruct views into Mexico while diminishing the property's value, as it would transform the natural landscape that he loves into an industrialized and surveilled corridor.

25. The river access and unblemished landscape are also central and fundamental to Mr. Keller's life and livelihood. Mr. Keller is an archaeologist, river guide, and longtime resident of the Big Bend region. He worked for approximately twenty years as an archaeologist with the Center for Big Bend Studies at Sul Ross State University and has spent decades conducting archaeological, historical, and preservation work throughout the Big Bend region and along the Rio Grande corridor. Mr. Keller regularly conducts archaeological research and fieldwork in areas directly affected by the Big Bend Border Wall Project. Until February 2026, Mr. Keller was conducting highly enjoyable paid archaeological fieldwork studying site preservation and

prehistoric settlement patterns along the Rio Grande corridor—including work at the Green Midden Site within Big Bend Ranch State Park and others located within the planned border-wall corridor. Because the proposed border wall and associated infrastructure threaten those sites, these archaeological efforts shifted from research, discovery, and long-term preservation toward salvage-oriented work. Rather than participate in efforts that assume the destruction of those resources, Mr. Keller suspended his fieldwork and devoted his full-time efforts to preserving those sites. He intends and wishes to resume his archaeological fieldwork if the Project is halted and those resources remain available for continued study.

26. In April 2026, CBP informed Mr. Keller that the government has identified a portion of his property for environmental assessments, surveys, appraisals, and other activities related to planned border-infrastructure construction. CBP requested that Mr. Keller grant the government a Right of Entry for Survey and Site Assessment and has followed up several times over the past three months regarding its request. Construction of the proposed border wall and associated infrastructure will impair Mr. Keller's access to the Rio Grande corridor and destroy his use and enjoyment and views of the landscape on his property, interfere with his archaeological studies and values, and alter the historic and cultural character of the places that make up his life's work. The Project has already caused Mr. Keller to cease ongoing archaeological fieldwork that he intended to continue and has caused him substantial emotional distress because it threatens resources, landscapes, and ways of life that he has spent decades studying, preserving, and enjoying. Unless the Project is halted, his long-standing use and enjoyment of the Big Bend region will end, as the Project would fundamentally alter the open, undeveloped character of the landscape that drew Mr. Keller to the region and that he regularly uses and enjoys.

27. Plaintiffs and Conserve Big Bend's Landowner Coalition members have been, and will continue to be, adversely affected by Defendants' violations of federal law, as described herein. These injuries will only be remedied if the Court grants the requested relief. Plaintiffs have no other adequate remedy at law.

28. Defendant U.S. DEPARTMENT OF HOMELAND SECURITY ("DHS") is an executive department of the United States. The Department's primary mission is to secure the homeland against terrorism and related threats, consistent with applicable statutory and constitutional requirements. As part of that mission, DHS must ensure that the economic security of the United States and the civil rights and liberties of its people are not diminished by the agency's efforts, activities, and programs aimed at securing the homeland. 6 U.S.C. § 111.

29. Defendant U.S. CUSTOMS AND BORDER PROTECTION ("CBP"), a component of DHS, is the federal agency responsible for safeguarding the borders of the United States, including by planning border barriers and related infrastructure. 6 U.S.C. § 211. CBP oversees the United States Border Patrol (the "Border Patrol"), which is the federal agency within CBP responsible for enforcing immigration laws between ports of entry. *Id.* § 211(e).

30. Defendant MARKWAYNE MULLIN, the Secretary of DHS, is sued in his official capacity. Secretary Mullin is the official responsible for ensuring that the actions and management decisions of DHS and its component agencies, including CBP, comply with all applicable laws, regulations, and the U.S. Constitution. The Secretary is ultimately responsible for implementing the challenged actions and ensuring agency compliance with federal law.

31. Defendant RODNEY S. SCOTT, the Commissioner of CBP (the "Commissioner"), is sued in his official capacity. Commissioner Scott is the official responsible for ensuring that the actions and management decisions of CBP comply with all applicable laws, regulations, and the

U.S. Constitution. The Commissioner is ultimately responsible for implementing the challenged actions and ensuring agency compliance with federal law.

## STATEMENT OF THE CLAIM

32. This action concerns the statutory authorities and limits governing the construction of border barriers and infrastructure, and the minimum federal substantive, procedural, and constitutional protections owed to those whose legally protected interests are infringed by Defendants' planning, approval, and implementation of the Big Bend Border Wall Project.

### A. Federal Authority and Law Governing U.S. Southwest Border Wall Construction

33. Federal law provides the Executive Branch with various authorities to secure the Nation's borders. For example, federal officials have long had authority "to control and guard the boundaries and borders of the United States against the illegal entry of aliens." 8 U.S.C. § 1103(a)(5). Congress has also directed the Secretary to achieve and maintain "operational control" of the border using a range of tools, including surveillance, personnel, technology, checkpoints, access roads, and vehicle barriers. Secure Fence Act of 2006, Pub. L. No. 109-367, § 2(a)–(b), codified at 8 U.S.C. § 1701 note. Congress has also authorized the Department of Defense to support counterdrug activities by constructing roads and fences and installing lighting to block drug-smuggling corridors, 10 U.S.C. § 284, and has further created a grant-funding mechanism for state and local participation in border-barrier construction, 8 U.S.C. § 1716.

34. The authorities allow the federal government to pursue border-security infrastructure, but do not displace ordinary legal requirements that govern federal construction projects, including generally applicable environmental, historic-preservation, procedural, and property-related protections.

35. In 1996, Congress enacted IIRIRA, which provides the Executive Branch with specific authority for barrier construction in areas of "high illegal entry." IIRIRA Section 102(a) authorizes the Secretary to "take such actions as may be necessary to install additional physical barriers and roads," in "the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." IIRIRA § 102(a), codified at 8 U.S.C. § 1103 note.

36. Congress required the Secretary to construct a certain number of miles of reinforced fencing on the southwest border but made clear that the Secretary is not required to install fencing, barriers, or other infrastructure in any "particular location," "if the Secretary determines that the use or placement of such resources is not the most appropriate means to achieve and maintain operational control over the international border at such location." IIRIRA § 102(b)(1)(D), codified at 8 U.S.C. § 1103 note.

37. IIRIRA requires the Secretary to consult with other federal agencies, States, local governments, Indian tribes, and property owners in the United States "to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed." IIRIRA § 102(b)(1)(C).

38. IIRIRA authorizes the Attorney General to promptly acquire easements, under the authority of Section 103(b) of the Immigration and Nationality Act ("INA") "as may be necessary to carry out this subsection and shall commence construction of fences immediately following such acquisition." IIRIRA § 102(b)(2). Under the INA, the Attorney General has land acquisition authority to "contract for or buy any interest in land" that is deemed "essential to control and guard the boundaries and borders of the United States." 8 U.S.C. § 1103(b).

39. A separate subsection of IIRIRA grants the Secretary an additional special and extraordinary power to waive legal requirements that the Secretary, in his discretion, "determines

necessary to ensure expeditious construction of the barriers and roads under [Section 102]." As originally enacted, IIRIRA authorized the government to waive provisions of the Endangered Species Act and the National Environmental Policy Act. IIRIRA § 102(c), Pub. L. No. 104-208, div. C. Later, the REAL ID Act amended IIRIRA to extend this waiver authority to its current form, whereby the Secretary may waive "all legal requirements [the] Secretary… determines necessary to ensure expeditious construction of the barriers and roads" authorized under IIRIRA Section 102. IIRIRA § 102(c)(1), codified at 8 U.S.C. § 1103 note.

40. In the subsection addressing the waiver authority, IIRIRA contains a judicial review provision that places some limits on the review of claims arising from Secretarial waiver decisions. *Id.*, IIRIRA § 102(c)(2). These judicial review restrictions do not extend to claims that do not arise from the waiver decision itself. *See In re Border Infrastructure Env't Litig.*, 915 F.3d 1213, 1222 (9th Cir. 2019); *N. Am. Butterfly Assn. v. Wolf*, 977 F.3d 1244, 1260–61 (D.C. Cir. 2020).

**B. The Big Bend Region and Border Patrol Activities**

41. The Big Bend region of Texas is a remote and distinctive landscape along the Rio Grande that includes protected public lands, private ranches, river corridors, cultural resources, and communities that depend on the region for ranching, recreation, tourism, conservation, and other economic and personal pursuits. The region is called "Big Bend" because it encompasses the Rio Grande's dramatic curvature around the Chisos Mountains. The region is recognized as one of the darkest night-sky locations in the continental United States and is valued for its exceptional opportunities for astronomical observation, scientific research, and public enjoyment. The Rio Grande corridor supports diverse wildlife and serves as an important migratory corridor for numerous species. The region has also been inhabited for thousands of years and contains archaeological sites, historic landscapes, and cultural resources of significance to Indigenous peoples and border communities.

42. The region's unique natural, cultural, and economic features have made it an important destination for visitors and a vital resource for the landowners, residents, businesses, and communities that depend upon it.

43. The lands and river corridors described above are not abstract scenic resources. They are working, lived-in, and actively used landscapes. Private landholdings in the region vary in size and are often managed for ranching, conservation, recreation, wildlife observation, scientific and cultural study, and tourism. These uses depend on the very features that define Big Bend: open terrain, access to and across river-adjacent lands, natural drainage patterns, dark skies, wildlife movement, and the continuity of the desert and river landscape. A massive border wall and related roads, lighting, gates, and construction activity will directly interfere with those uses and transform the character and function of the lands that the Plaintiffs seek to protect.

44. For border-enforcement purposes, the Big Bend region is encompassed primarily within CBP's Big Bend Sector, one of nine sectors along the southwest border. The Big Bend Sector encompasses 517 miles, or roughly one-quarter of the border. The following maps[1] depict the Big Bend Sector, among the nine sectors and in a closer view of the border within the sector:

[1] Source: ArcGIS Online, https://www.arcgis.com/home/item.html?id=325a78edbc5041f49887ee5846e16841.


Big Bend Sector
Las Vegas
Mojave Desert
Colorado Plateau
Santa Fe
Albuquerque
San Francisco Plateau
Arizona
New Mexico
Oklahoma
Tulsa
Oklahoma City
Amarillo
Ouachita Mountains
Los Angeles
Phoenix
Lubbock
San Diego
Mexicali
Sonoran Desert
Tucson
Dallas
Juárez
Midland
Texas
Edwards Plateau
Austin
Houston
San Antonio
Hermosillo
Chihuahua
Bahia Sebastian Viscaino
Gulf of California
Torreón
Monterrey


10
20
67
10
10
10
7546 ft
4623 ft
285
67
5444 ft
Rio Grande
Rio Grande Wild and Scenic River
Ojinaga
Big Bend National Park
Santa Elena Canyon Park
67D
Ocampo Park
hua

45. Historically, the Big Bend Sector's migration and enforcement patterns have differed from those of many other sectors along the southwest border, reflecting the region's unique geography, terrain, and land-use characteristics. The government's own data concerning apprehensions and encounters, as recounted in the following paragraphs,[2] provide context regarding those patterns and the relative level of unlawful border crossings within the Sector.

46. According to CBP, in FY 2025, of the nine sectors comprising the southwest border, the Big Bend Sector tallied the fewest apprehensions (1.3% of the total), despite covering the largest number of miles along the southwest border:

| Sector | FY 2025 Apprehensions | Border Miles | Apprehensions Per Mile |
|---|---|---|---|
| San Diego | 49,902 | 60 | 831.70 |
| El Paso | 47,165 | 268 | 175.99 |
| Tucson | 41,287 | 262 | 157.58 |
| Rio Grande Valley | 36,391 | 320 | 113.72 |
| Del Rio | 32,780 | 245 | 133.80 |
| Laredo | 14,562 | 136 | 107.07 |
| Yuma | 7,722 | 126 | 61.29 |
| El Centro | 4,633 | 70 | 66.19 |
| **Big Bend** | **3,096** | **517** | **5.99** |

47. This is consistent with the last five fiscal years (i.e., the period cited in the Determinations): the Big Bend Sector accounted for 1.16% of all apprehensions during that time and had the lowest number of apprehensions each year. The average number of apprehensions across the sectors was nearly five to 35 times higher than that of Big Bend each year.

[2] Sources: CBP, Nationwide Encounters, https://www.cbp.gov/document/stats/nationwide-encounters (last accessed Sept. 13, 2026); CBP, Sectors and Stations, https://www.cbp.gov/border-security/along-us-borders/border-patrol-sectors (last accessed Sept. 13, 2026).

48. The following table shows the number of encounters in the past five fiscal years by southwest border sector.

| Sector | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | FY 2021-2025 |
|---|---|---|---|---|---|---|
| San Diego | 142,459 | 176,290 | 230,941 | 324,260 | 49,902 | 923,852 |
| El Paso | 193,918 | 307,844 | 427,471 | 256,102 | 47,165 | 1,302,683 |
| Tucson | 191,232 | 251,984 | 373,625 | 463,567 | 41,287 | 1,321,695 |
| Rio Grande Valley | 549,077 | 468,124 | 338,337 | 135,099 | 36,391 | 1,527,028 |
| Del Rio | 259,294 | 480,931 | 393,226 | 244,105 | 32,780 | 1,410,336 |
| Laredo | 112,241 | 106,843 | 45,644 | 31,108 | 14,562 | 310,398 |
| Yuma | 114,488 | 310,094 | 174,201 | 53,877 | 7,722 | 660,382 |
| El Centro | 59,231 | 72,378 | 50,570 | 17,484 | 4,633 | 204,296 |
| **Big Bend** | **37,266** | **31,948** | **11,823** | **4,921** | **3,096** | **89,054** |

49. The following charts illustrate the extremely low number of apprehensions in the Big Bend Sector, measured by total encounters and encounters per border mile.

**Southwest Border Encounters, By Sector**



**Southwest Border Encounters Per Border Mile, By Sector**




50. At the end of 2025, CBP announced that the "Big Bend Sector reported a significant reduction in apprehensions for illegal border crossings in Fiscal Year 2025, contributing to better operational control of the border."[3] CBP reported that the "Big Bend Sector recorded 11,823 apprehensions in FY 2023 and 3,096 in FY 2025," representing "a decline of 74 percent when compared to two fiscal years ago."

51. Historical CBP statistics show that the Big Bend Sector has long experienced low apprehension levels.[4] Indeed, Big Bend has recorded the fewest apprehensions of any southwest border sector every year since FY 1973—i.e., for the last 53 consecutive years. CBP reported only 3,096 apprehensions in the Big Bend Sector in FY 2025—that is the lowest fiscal year total

---

[3] *See* CBP, *Illegal border crossings in Big Bend Sector fall significantly in FY 2025* (Dec. 5, 2025), https://www.cbp.gov/newsroom/local-media-release/illegal-border-crossings-big-bend-sector-fall-significantly-fy-2025.

[4] *See* CBP, *U.S. Border Patrol Fiscal Year Southwest Border Sector Apprehensions* (FY 1960–FY 2018), https://tinyurl.com/4bmsmyk6; CBP, *U.S. Border Patrol Apprehensions From Mexico & Other Than Mexico (FY 2000–FY 2020)*, https://tinyurl.com/dhtf8d7j.

recorded for any single southwest border sector since fiscal year 1967 and the lowest for the Big Bend Sector since fiscal year 1963.

52. The number of apprehensions is so low in significant part due to the difficult mountainous desert terrain and inhospitable temperatures and other conditions in the sector.[5]

**C. The Secretary's Improper Determinations that the Big Bend Sector is an Area of "High Illegal Entry"**

53. On October 15, 2025, then-Secretary of Homeland Security Kristi Noem issued a Determination finding that "the Big Bend Sector, which is in the vicinity of the United States border and located in the state of Texas, is an area of high illegal entry." 90 Fed. Reg. 48286, 48287 (Oct. 15, 2025). The Determination did not provide any further description or limitation of the area at issue. In support of her "high illegal entry" Determination, Secretary Noem provided a two-sentence description: "Between fiscal year 2021 and July 2025, the [Border Patrol] apprehended over 88,595 illegal aliens attempting to enter the United States between border crossings in the Big Bend Sector. In that same time period, Border Patrol seized over 86,851 pounds of marijuana, over 863 pounds of cocaine, over 12 pounds of heroin, over 1,084 pounds of methamphetamine, and over 94 pounds of fentanyl." *Id.* at 48287.

54. As a result of this "high illegal entry" Determination, Secretary Noem declared that "DHS will take immediate action to construct additional barriers and roads in the Big Bend Sector." *Id.* Secretary Noem reasoned that, because Congress "mandated DHS to achieve and maintain operational control" of the border and Congress defined "'operational control' as the prevention

---

[5] *See* J. David Goodman, *Texas Border Wall Plan in Big Bend Draws Opposition from Republicans & Democrats*, N.Y. Times (Mar. 30, 2026), https://www.nytimes.com/2026/03/30/us/texas-border-wall-big-bend.html.

of all unlawful entries into the United States," "I must use my authority under section 102 of IIRIRA to install additional barriers and roads in the Big Bend Sector." *Id.*

55. Having invoked IIRIRA's construction authority under Section 102, Secretary Noem then purported to waive over two dozen laws to expedite construction. The purportedly waived requirements address items necessary for the "installation and upkeep of physical barriers, roads, supporting elements, drainage, erosion controls, safety features, lighting, cameras, and sensors." *Id.*

56. On the same day, Secretary Noem made near-identical determinations for each of the other eight sectors that comprise the southern border and issued corresponding waivers for each of them. *See* 90 Fed. Reg. 48281 (Oct. 15, 2025) (Tucson Sector); 90 Fed. Reg. 48282 (Oct. 15, 2025) (El Centro Sector); 90 Fed. Reg. 48283, 48284 (Oct. 15, 2025) (Del Rio Sector); 90 Fed. Reg. 48284, 48285 (Oct. 15, 2025) (Rio Grande Valley Sector); 90 Fed. Reg. 48285, 48286 (Oct. 15, 2025) (Yuma Sector); 90 Fed. Reg. 48287, 48288 (Oct. 15, 2025) (Laredo Sector); 90 Fed. Reg. 48288, 48289 (Oct. 15, 2025) (El Paso Sector); 90 Fed. Reg. 48289, 48290 (Oct. 15, 2025) (San Diego Sector).

57. Each of these *en masse* determinations contained the same, brief reasoning, with the only differences being the amount of apprehensions and drug confiscations specific to the region.

58. On February 17, 2026, Secretary Noem issued a second Determination with respect to the Big Bend Sector. As before, Secretary Noem reiterated her conclusion that the "United States Border Patrol Big Bend Sector is an area of high illegal entry," and provided two sentences of support that were substantially similar to the prior October 2025 Determination. 91 Fed. Reg. 7297, 7298 (Feb. 17, 2026) ("Between fiscal year 2021 and fiscal year 2025, Border Patrol

apprehended over 89,000 illegal aliens attempting to enter the United States between border crossings in the Big Bend Sector. In that same time period Border Patrol seized over 87,574 pounds of marijuana, over 867 pounds of cocaine, over 1,156 pounds of methamphetamine, over 12 pounds of heroin, and over 94 pounds of fentanyl.").

59. The February 2026 Determination for the first time defined a Project area by GPS coordinates that stretched from Hudspeth County into the Big Bend Ranch State Park. *Id.*

60. On May 15, 2026, Secretary Mullin issued a third Determination with respect to the Big Bend Sector. It contained the same two-sentence explanation as the February 2026 Determination. Its description of the Project area changed to a different part of the Big Bend Sector. On June 9, 2026, Secretary Mullin issued a fourth Determination that corrected a purported incorrect Project description in the May 2026 Determination. 91 Fed. Reg. 34831 (June 9, 2026). The June 2026 Determination extended the Project area east past Big Bend National Park.

61. On July 2, 2026, Secretary Mullin issued a fifth Determination regarding the Big Bend Sector. 91 Fed. Reg. 40550 (July 2, 2026). The only change was as to the laws the Secretary purported to waive.

62. On July 27, 2026, Secretary Mullin issued a sixth Determination to add a new Project area, partially within the Big Bend Sector and partially within the Del Rio Sector. 91 Fed. Reg. 46939 (Jul 27, 2026). This Determination extended the Project area east past the end of the Big Bend Sector.

63. Collectively, the Determinations (along with a similar determination for the El Paso Sector) cover the entirety of the Big Bend Sector, declaring all 517 border miles an "area of high illegal entry."

**D. The Determinations Lack Any Reasoned Analysis and Are Contradicted by the Government's Own Data and Statistics**

64. The barebones rationale contained in the Secretary's Determinations has no reasonable relation to the Determinations themselves. As explained above, the number of apprehensions in the Big Bend Sector is exceedingly low relative to every other sector along the southwest border. During the five years cited by the Secretary in the Determinations, apprehensions in the Big Bend sector accounted for *only 1.16%* of the total along the southwest border. The average number of apprehensions across all sectors during this five-year period was nearly *five to 35 times higher* than that of the Big Bend Sector. The number of apprehensions in the Big Bend Sector has also been steadily declining during that time, with FY 2025 having the lowest number of apprehensions recorded by any sector in the region since 1967.

65. Although the Determinations also cited drug seizures as support, such information is irrelevant under the statute. IIRIRA permits the Secretary to proceed with expedited construction "to deter illegal crossings in areas of high illegal entry into the United States." The volume of illegal drugs confiscated within a region does not satisfy that statutory inquiry. And even if the volume of drugs seized could be relevant under IIRIRA, the Big Bend Sector accounts for an exceedingly small proportion of the drugs seized along the southwest border.

66. Other than marijuana, CBP data[6] show that the volumes of drugs seized in the Big Bend Sector as cited in the Determinations accounted for less than one percent of all drug volumes seized along the southwest border in that five-year period: cocaine – 0.58%, methamphetamine – 0.15%, heroin – 0.13%, fentanyl – 0.11%. Of all nine southwest border sectors, Big Bend had the

[6] Sources: CBP, Nationwide Drug Seizures, https://www.cbp.gov/document/stats/nationwide-drug-seizures (last accessed Sept. 12, 2026).

second lowest quantity seized for heroin, the second lowest for methamphetamine, and the third lowest for fentanyl.

67. Moreover, the same CBP data show that the vast majority of seizures for all drugs other than marijuana occur at official border ports of entry. This includes 84.65% of cocaine, 87.5% of fentanyl, 74.95% of heroin, and 90.71% of methamphetamine during the five-year period cited in the Determinations. The opposite is true for marijuana: CBP seizes a larger percentage outside of border ports of entry (74.14% during the prior five fiscal years). The Secretary's reliance on marijuana seizure data for the Big Bend Sector is unsound. Unlike its apprehension statistics, the seizure figures do not measure activity occurring at the border between ports of entry or even at ports of entry. The Determinations rely instead on aggregate, sector-wide marijuana seizure totals, reflecting drug interdictions at interior checkpoints. The cited drug-seizure figures in the Determinations are misplaced because they aggregate seizures occurring throughout the entirety of the 165,000-square-mile Big Bend Sector and do not identify whether, where, or to what extent the seized drugs actually crossed the border within the Project areas at issue. The significance of marijuana-seizure data is further diminished by the substantial increase in domestic marijuana production in recent years. *See* U.S. Drug Enforcement Administration, 2020 National Drug Threat Assessment 48 (Mar. 2021) ("Mexican marijuana has largely been supplanted by domestic-produced marijuana.").

**E. DHS's Big Bend Border Wall Project**

68. DHS's announcement that it "will take immediate action to construct additional barriers and roads in a segment of the border in the Big Bend Sector" was coupled with Project descriptions noting that a border barrier design will feature a 30-foot-high barrier made of six-inch-square diameter steel bollards, among other features.

69. The Director, Infrastructure Portfolio, for the U.S. Border Patrol Program Management Office Directorate ("PMOD") within CBP executed a declaration in other litigation relating to the border wall proposed for the Big Bend Sector (the "PMOD Declaration"), which described the plans with respect to construction of barriers within the Big Bend Sector. *See* ECF No. 38-1, *Friends of Riudoa Church v. Mullin*, No. 3:26-cv-1099 (E.D. Tex. Aug. 24, 2026). As stated in the PMOD Declaration, PMOD is tasked with managing the schedule, finances, real estate acquisition, environmental planning, and construction of the border infrastructure system along the U.S. border.

70. The PMOD Declaration describes the border wall plans for the Big Bend Sector in terms of five Projects: Big Bend 1 that covers the westernmost part of the sector in Hudspeth County; Big Bend 2 that covers most of Presidio County, including the town of Presidio and up to Big Bend Ranch State Park; Big Bend 3 that covers the northwestern part of Presidio County; Big Bend 4 that covers portions of Big Bend Ranch State Park, Big Bend National Park, and some private land northeast of Big Bend National Park; and Big Bend 5 that covers the eastern part of the sector and part of the Del Rio Sector up to Lake Amistad. The PMOD Declaration includes maps of these five Projects and descriptions of the border wall planned.

71. The PMOD Declaration identifies current plans for border wall construction in the Big Bend Sector. Contracts for Big Bend 1, Big Bend 2, and Big Bend 3 were all awarded on March 5, 2026. Big Bend 1 will include 47 miles of barrier system, Big Bend 2 will include 61 miles of barrier system, and Big Bend 3 will include 56 miles of barrier system. The PMOD Declaration explains that the elements of the barrier system include "30-foot bollard-style pedestrian barrier, a patrol road, and barrier system attributes, including, as appropriate to each area, cameras, lights, sensors, and other detection technology." The PMOD Declaration states that

CBP expects to include gates as part of the Big Bend 1-3 Project areas. A contract for Big Bend 5 was awarded on June 2, 2026, and will include 160 miles of vehicle barrier system.

72. Field work on Big Bend 1 and Big Bend 3 has begun. As of August 24, 2026, CBP expects that field work will begin in Big Bend 2 within "weeks." On June 3, 2026, Secretary Mullin testified "We are on track to have the primary wall done, completed, from the Pacific to the Gulf of America this time next year."

73. The Big Bend Border Wall Project was immediately met with staunch opposition from across the political spectrum. A bipartisan group of sheriffs released a joint statement condemning the wall, saying it "would not represent the most practical or strategic approach to border security in [the] area."[7] One sheriff is a former Border Patrol officer who noted that the Big Bend sector is "the least active sector along the U.S.-Mexico border."[8]

74. Over one hundred conservation groups, outfitters, and rural Texas businesses wrote to Congress asking them to block funding for the Project's construction.[9] And in early April, over 2,000 protesters gathered in front of the Texas Capitol in a bipartisan protest against the construction of the wall.[10]

75. By pursuing a path of expedited construction, the Secretary has deprived the public of participation in important decision-making processes and cut off established federal processes designed to ensure consideration of environmental, cultural, economic, and historical factors.

---

[7] Travis Bubenik, *West Texas Sheriffs Speak Out Against Big Bend Area Border Wall Plans*, Marfa Pub. Radio (Mar. 10, 2026), https://www.marfapublicradio.org/news/2026-03-10/west-texas-sheriffs-speak-out-against-big-bend-area-border-wall-plans.

[8] *See* Goodman, *supra*.

[9] *See* https://www.sierraclub.org/press-releases/2026/03/sierra-club-joins-130-groups-urging-congress-block-border-wall-construction.

[10] *Big Bend Wall Protest Draws Thousands to Texas Capitol*, Pub. Domain Media (Apr. 6, 2026), https://www.publicdomain.media/p/big-bend-wall-protest.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the APA, 5 U.S.C. § 706(2)(A), (C), and IIRIRA Section 102 – Contrary to Law and in Excess of Statutory Authority

76. The paragraphs above are incorporated and reasserted as if fully set forth here.

77. A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law" or is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

78. Through IIRIRA, Congress crafted a calibrated scheme that the Secretary must follow in determining when, where, and how to undertake construction of border barriers and related infrastructure. The Secretary's Determinations are contrary to law because they violate IIRIRA in at least three ways.

79. First, IIRIRA Section 102(a) limits the authority to construct physical barriers and roads to areas of "high illegal entry." The Secretary's Determinations flout this legal scheme by construing the "high illegal entry" requirement into a nullity. For the reasons articulated above, the number of illegal entries in the Big Bend Sector cannot reasonably be considered "high." Defendants improperly conflate the "high illegal entry" requirement in IIRIRA Section 102(a) with the "operational control" goal in the Secure Fence Act of 2006. Instead of assessing whether the illegal entries in the Big Bend Sector are actually "high" under any reasonable meaning of that term, as required by IIRIRA Section 102(a), the Secretary concluded that because DHS has been directed to achieve operational control of the border to prevent unlawful entries, the Secretary "must" install barriers and roads in the Big Bend Sector. *See, e.g.,* 91 Fed. Reg. at 7298. The Secretary has effectively made a per se determination that any area on the border where *any* illegal entry occurs automatically allows a "high illegal entry" determination under IIRIRA Section

102(a). This interpretation of IIRIRA's text is contrary to law and reads the "high illegal entry" requirement out of the statute.

80. Second, the Secretary's Determinations are unlawful because they fail to make any assessment at all—as is required by IIRIRA Section 102(b)—that construction of the border barriers in the Project areas is the "most appropriate means to achieve and maintain operational control," or that these are the areas in which fencing would be the "most practical and effective." IIRIRA § 102(b)(1)(A), (D). Similarly, Congress limited the government's related land acquisition authority to land deemed "essential to control and guard the boundaries and borders of the United States." 8 U.S.C. § 1103(b). As explained above, the Big Bend Project areas are precisely the type of locations where fencing is not the "most practical and effective," is not the "most appropriate" means of achieving operational control and is not "essential to control and guard the boundaries and borders of the United States." The Secretary nevertheless made no such determination and offered no analysis addressing Section 102(b)'s requirements.

81. Third, the Secretary's Determinations are separately unlawful because they purport to authorize installation of infrastructure, such as cameras and lighting, beyond "additional physical barriers and roads," which is all that is authorized under IIRIRA.

82. To the extent IIRIRA could be construed to permit the Secretary to declare any segment of the border an area of "high illegal entry," regardless of the actual circumstances and the amount of illegal entry occurring in that segment, as is the case here, that interpretation would also raise serious constitutional concerns under the major questions doctrine and separation of powers principles.

83. For these and other reasons, the Secretary's Determinations are unlawful and cannot serve as a basis for the Big Bend Border Wall Project.

## COUNT II
**Violation of the APA, 5 U.S.C. § 706(2)(A), (E) – Arbitrary and Capricious, Abuse of Discretion, and Unsupported by Substantial Evidence**

84. The paragraphs above are incorporated and reasserted as if fully set forth here.

85. A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious," or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E).

86. The Secretary's decision to "take immediate action to construct additional barriers and roads in the Big Bend Sector" hinges on the Secretary's Determinations that the Project areas are "areas of high illegal entry into the United States." IIRIRA § 102(a).

87. The Secretary's Determinations that the "United States Border Patrol Big Bend Sector is an area of high illegal entry" are arbitrary and capricious and without substantiation for several reasons.

88. First, Defendants failed to provide an adequate explanation as to why the Big Bend Sector is deemed an area of "high illegal entry." The Secretary's Determinations contained only two sentences of purported support for the Determinations, which merely provide the asserted levels of apprehensions and drug seizures in the entirety of the Big Bend Sector over a five-year period. The Determinations offer no explanation or context as to why those levels constitute "high illegal entry," or whether and why the "high illegal entry" label can be applied to the entirety of the extensive region covered by the Determinations, leaving the public with only a conclusory assertion applied in sweeping fashion.

89. Second, the Secretary's Determinations run directly contrary to the agency's own assessment made just months before, when CBP announced that the Big Bend Sector had experienced "a decline of 74 percent" in apprehensions between FY 2023 and FY 2025.

Defendants failed to acknowledge and did not explain this important factor when issuing the "high illegal entry" Determinations.

90. Third, the Secretary's Determinations are not supported by substantial evidence. The Secretary did not address or explain the fact that CBP's historic data consistently show that of the nine sectors of the southwest border, the Big Bend Sector has had the *fewest* apprehensions by far, including in the five years cited by the Secretary in support of the Determinations. The Secretary's opposite conclusion is arbitrary and capricious, without support, and is directly contradicted by the agency's own data.

91. Fourth, the Secretary's Determinations are based upon an unreasonably and overinclusive dataset that dilutes its probative value. The Secretary's Determinations relied on the combined apprehensions over a five-year period rather than looking at the most recent annual data, which is the method that has historically been used for all "high illegal entry" determinations made prior to July 2025. Reliance on a five-year period is arbitrary and represents an unexplained departure from the agency's prior approach to determining "high illegal entry."

92. Fifth, the Secretary unreasonably relied upon drug seizure data in making the Determinations. The volume of drugs seized is not a basis for determining "high illegal entry." Even if it were, the Secretary did not address or explain the fact that CBP data show that the Big Bend Sector accounts for among the lowest volumes of most drugs seized along the southwest border. Nor did the Secretary address that, even as to marijuana, the numbers are low when considering the size and circumstances of the Big Bend Sector.

93. Finally, the Secretary failed to make any finding whatsoever, in contravention of IIRIRA, that construction of the border wall in these areas is the "most appropriate means to

achieve and maintain operational control" of the southern border, or that these are the areas in which fencing would be the "most practical and effective."

94. For these and other reasons, the Secretary's Determinations are arbitrary and capricious and cannot serve as a basis for the Big Bend Border Wall Project.

**COUNT III**
***Ultra Vires* Action**

95. The paragraphs above are incorporated and reasserted as if fully set forth here.

96. Defendants cannot take any action that exceeds the scope of their statutory or constitutional authority.

97. Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). Equitable relief is available against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

98. The government has identified no valid source of legal authority for the Big Bend Border Wall Project. Nothing in IIRIRA or any other federal immigration law or authority empowers DHS to indiscriminately proceed with the planned, expedited border barrier construction. To the contrary, IIRIRA affirmatively establishes limits and Defendants have far exceeded the outer bounds of that statute.

99. By issuing the Determinations, sending Notice of Interest Letters and Right-of-Entry for Construction agreements, and proceeding with the Big Bend Border Wall Project, Defendants have acted beyond their statutory and constitutional authority and engaged in an *ultra vires* action. These actions individually and in their totality are *ultra vires* because they are beyond

the scope of Defendants' authority and, therefore, the Court should hold them unlawful and set them aside.

**COUNT IV**
**Violation of the Fifth Amendment's Due Process Clause**

100. The paragraphs above are incorporated and reasserted as if fully set forth here.

101. Defendants' decision to proceed with expedited border wall construction will deprive Plaintiffs of their property, liberty, and other protected interests without due process.

102. By improperly invoking IIRIRA Section 102, Defendants seek to foreclose affected landowners and others from having a meaningful opportunity to be heard on the government's decision and plans, or to even obtain review over whether the Secretary has satisfied Section 102's statutory prerequisites and thus whether the agency is exceeding the limits Congress imposed on its authority.

103. The breadth of the Determinations, which seek to broadly designate the entirety of the Big Bend Sector as an area of "high illegal entry," despite the government's own statistics to the contrary and without any attempt to determine whether some narrower area meets this statutory criterion, deprives Plaintiffs of protected interests without due process of law, including by implementing policies and practices that unreasonably interfere with Plaintiffs' property rights.

104. Plaintiffs are threatened with, or are suffering and will continue to suffer, irreparable injury unless this Court orders the requested relief. Such injuries include, inter alia, violation of their right to consultation prior to the taking of any interest in their property, clouding of their title to their properties, interference with their right to privacy, and interference with their normal and exclusive use of their private property. Damages cannot adequately address the threatened injuries and injuries suffered by Plaintiffs.

**COUNT V**
**Violation of the Take Care Clause**

105. The paragraphs above are incorporated and reasserted as if fully set forth here.

106. Article II of the U.S. Constitution provides that the "executive Power shall be vested in a President," U.S. Const. Art. II, § 1, cl. 1, and that "he shall take Care that the Laws be faithfully executed," U.S. Const. Art. II, § 3.

107. Among the laws that the Take Care Clause mandates be "faithfully executed" are the conditions and limitations of IIRIRA Section 102 itself. Congress did not grant the Executive Branch unlimited authority to construct border barriers and related infrastructure throughout the southwest border. Rather, Congress conditioned the exercise of that authority on specified substantive and procedural limitations, including the requirement that such construction occur in areas of "high illegal entry."

108. The challenged Determinations expressly invoke Executive Order 14165 and the Administration's objective of achieving and maintaining operational control of the border. But Congress did not authorize Defendants to pursue that policy objective without regard to the limitations imposed by Section 102. The Executive Branch's duty to faithfully execute the laws requires adherence to Congress's condition that construction occur in areas of high illegal entry. By treating the occurrence of any unlawful entry as sufficient to satisfy Congress's requirement of "high illegal entry," Defendants have dispensed with the statutory condition Congress placed on the exercise of Section 102 authority and have failed to faithfully execute the law in violation of Article II.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

1. A declaratory judgment stating that the Secretary's "high illegal entry" Determinations for the Big Bend Sector, the resulting Big Bend Border Wall Project, and all related notices and activities to effectuate the Project are unlawful, null, and void;

2. A preliminary and a permanent injunction against the Secretary, DHS, CBP, the Commissioner, and their officers, agents, employees, and contractors, prohibiting them from proceeding with the Project in the absence of lawful authority and required procedures;

3. An order vacating and setting aside the Secretary's "high illegal entry" Determinations for the Big Bend Sector, and all agency actions and notices issued to effectuate the Project;

4. Award Plaintiffs their reasonable attorneys' fees and costs, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and other authorities as appropriate;

5. Grant such other and further relief as the Court deems just and proper.

Plaintiffs demand a trial by jury on all issues so triable.

Date: September 14, 2026

Respectfully submitted,

*/s/ Varu Chilakamarri*
Varu Chilakamarri, Bar. No. 90023656
Stephen G. Topetzes, Bar No. 424593
Barry M. Hartman, Bar No. 291617
Theodore L. Kornobis, Bar No. 997236
K&L GATES LLP
1601 K Street, NW
Washington, DC 20006
Phone: (202) 778-9165
varu.chilakamarri@klgates.com
stephen.topetzes@klgates.com
barry.hartman@klgates.com
ted.kornobis@klgates.com

David Wang (pro hac vice pending)
K&L GATES LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
Phone: (206) 370-6554
david.wang@klgates.com

*Counsel for Plaintiffs*